EXPRESS COMPANY *v.* JACKSON.

(*Nashville.*    March  4,  1893.)

1. COMMON CARRIER.   *Liability for injury to live-stock.*

Suit for injuries sustained by live-stock during shipment.   Prior to May 31, 1889, the express company contracted with Jackson to make shipment of thorough-bred horses from Belle Meade, Tenn., to Hunt's Point, N. Y., where they were to be sold on June 17, 1889.   This shipment was to be made in safe and suitable cars, by fast train, in charge of company's agent, and to arrive at destination some days before the sale.   The Johnstown flood occurred on May 31, 1889, breaking the company's ordinary line for eastern transportation. This was known to both parties when, on June 6, 1889, the company received the horses and began their shipment.   The company selected one of several available lines as a substitute for the broken line, and the proof tends to show that it did not select the best one.   The proof also tends to show that the company did not take the precaution to secure transportation in advance.   Upon the substitute line selected the cars containing the horses were hitched to a coaling train that conveyed them only seventy-two miles in twelve hours, during which the horses, abandoned by the company's agent, were subjected to such treatment as resulted in serious injury.

*Held:*  The express company is liable for the injuries sustained by the horses.   The act of God—the Johnstown flood—was not the proximate cause of the injury.   It occurred before the shipment began, and was then fully known to the company.   The subcarrier's negligence was imputable to the express company, its principal.

2. SAME.   *Express company is.*

Doctrine re-affirmed that an express company is a common carrier, and subject to all the duties and responsibilities attaching to that character.

Cases cited and approved:  Railroad *v.* Wynn, 88 Tenn., 320;  Transportation Co. *v.* Bloch Bros., 86 Tenn., 392;  Baker *v.* Railroad, 10 Lea, 304;  Railroad *v.* Jackson, 6 Heis., 271;  Railroad *v.* Hale, 85 Tenn., 69;  Smitha *v.* Railroad, 86 Tenn., 198;  Railroad *v.* Mason, 11 Lea, 116;  112 U. S., 331;  71 Wis., 372;  1 Am. St. Rep., 721;  5 Am. St. Rep., 226.

3. SAME. *Act of God.*

The act of God which will excuse a common carrier from liability, must be the proximate, not merely the remote, cause of the loss or injury. Hence the Johnstown flood, having occurred and being known before the shipment was undertaken, could not excuse the carrier from liability for loss occurring in the course of transportation, voluntarily undertaken with full knowledge of the situation. It, perhaps, might have justified the company in refusing to undertake the shipment.

Cases cited and approved: Railroad *v.* Wynn, 88 Tenn., 320; Transportation Co. *v.* Bloch Bros., 86 Tenn., 392; 27 Conn., 607; 54 N. Y., 504; 4 Zab. (N. J.), 697; 1 Murphy (N. C.), 173; 10 Wall., 176.

4. SAME. *Subcarriers are agents of carrier, not of the shipper.*

Doctrine re-affirmed that subcarriers are agents of the carrier, and not agents of the shipper, in the absence of special contract.

Case cited and approved: Transportation Co. *v.* Bloch Bros., 86 Tenn., 392.

---

FROM DAVIDSON.

---

Appeal from Circuit Court of Davidson County. W. K. McALISTER, J.

BAXTER, HUTCHESON & BAXTER and BAXTER SMITH for Express Company.

E. H. EAST and STEGER, WASHINGTON & JACKSON for Jackson.

WILKES, J. The Adams Express Company was sued as a common carrier for damages alleged to have been sustained on a shipment of thorough-

bred horses from Nashville, Tennessee, to Hunt's Point, New York.

The declaration contained two counts—one for alleged breach of a special contract, and the other for the breach of the common law duty of the express company as a common carrier.

The company pleaded the general issue, not guilty. There was verdict and judgment against the company for $8,000, from which it appealed.

The shipment was made from Belle Meade June 6, 1889. The horses were to be exposed to public sale at Hunt's Point by Wm. Easton, on June 17, 1889, and notice of the sale had been extensively given by advertisement all over the United States.

Much correspondence was had between the company and Gen. W. H. Jackson for several months before the shipment, the object of the shippers being to have the horses transported in properly constructed cars, with good ventilation, at a high rate of speed, to avoid long confinement, and in time to reach their destination for several days before the sale, in order that they might rest and recuperate.

The plaintiffs insist that they had a special contract with the company to furnish four red baggage-cars, such as were used by the Pennsylvania Railroad Company, which were well ventilated and suited for the transportation of live-stock; that the horses were to be carried at *express rates* of speed, so that the time consumed

would not exceed forty-eight hours; that the train should be run as a *special*, and in charge of an agent of the company the entire route.

They allege that only one red baggage-car was run, and the others were poorly ventilated; that the time consumed was eighty-six hours; that at Pittsburg, Pa., they were abandoned by the agents of the company, and were attached to a coaling-train, and carried seventy-two miles behind it in twelve hours; and that the horses were badly injured and frightened by backing, switching, jamming, and being thrown down in the cars.

They also insist that, in the absence of any special contract, the company was legally bound as a common carrier, and breached its duty by failing to transport the horses in a reasonable time, to furnish suitable cars, to provide a route-agent, and by allowing the horse-cars to be attached to a coaling-train on a portion of the route, in consequence of which the horses were injured by the backing, switching, and jamming of such a train.

It was originally intended that the stock should be shipped on the fourth or fifth of June, and that they would go from Cincinnati to New York over the Pennsylvania Central Railroad, over which line the express company carried its shipments. On May 31, 1889, however, an unprecedented flood occurred at Johnstown, Pa., on this line of road, about seventy miles east of Pittsburg, which completely washed away several miles of the road, and stopped all passage over the same for several days.

This fact was well known, both to the company and the shippers, several days before the shipment was made. The company, however, received the stock about three o'clock on the evening of June 6, 1889, reached Cincinnati with them at seven o'clock the next morning, and Pittsburg at seven o'clock in the evening thereafter. Up to this point every thing went well. The horses were carried safely, and at a high rate of speed, and in care of an agent. This was something over half-way to New York, but, the break in the road at Johnstown not having been repaired, the horses could be carried no farther over the Pennsylvania road, nor did the Adams company have any route open to New York from that point. The express company thereupon delivered the horses to Wells-Fargo & Co. Express, to be carried over the Pittsburg and Western Railroad to Leavittsburg, on the N. P. & O. R. R., thence to Elmira, N. Y., where the Adams company would again take them in charge and carry them over the Lehigh Valley Road to New York.

The horses were delivered to the Wells-Fargo & Co. Express at night, at or near Pittsburg, and by it were carried, over the Pittsburg and Western Railroad, to Leavittsburg, attached to a coaling-train, a distance of seventy-two miles, consuming twelve hours in the transit. The testimony is that between these two points there was much switching, jerking, and bumping of cars, noise and smoke from passing engines, and that in conse-

quence the horses took fright, reared, plunged, and became unmanageable, and many of them were thrown down, crippled, bruised, and roughly treated.

The real controversy in the case narrowed down to and turned upon the liability of the company for the physical injuries to the horses, nearly, if not quite, all of which were sustained between these points.

The express company claims that it did the best it could under the circumstances; that it could not carry the horses farther over the line usually used by it; that it had a right to select another route, and transship the horses to another company; that, before shipping the horses, it had notified the shippers of all the facts, and requested them to delay shipment for a few days until their regular line was opened, which they declined to do; and that when it delivered the horses to the Wells-Fargo Company, that company, under the circumstances, became the agent of the shippers, and not of the Adams Express Company.

The shippers, however, insist that they could not delay shipment, as their sale had already been advertised for a certain date; that they did not assume to dictate what route or means the express company should adopt to reach New York; that they had nothing to do with the Wells-Fargo & Co. Express, and did not even know that any other company was to carry the stock, no matter what route might be selected; that the Adams company

undertook to carry the stock safely to New York, and were bound, both under their special contract and under their common law liabilities as common carriers, to carry them to destination; and if it employed another company over any part of the route, such company would be the agent of Adams company, and not of the shippers.

Many errors are assigned to the charge of the Court below, but the controversy turns mainly upon one or two questions, the decision of which disposes of all the exceptions. The express company, after the interruption of their route by the floods, could have declined altogether to make the shipment, on the ground that the act of God had prevented it from safely and properly complying with its contract, as a common carrier, to transport the horses. Under the facts, this might have been a good defense. Having undertaken, however, to take the shipment, with the knowledge of the facts, the full extent of its liability as a common carrier attached, and it cannot set up as a defense the plea of a sudden emergency which would absolve it from liability under the facts of this case.

An express company is a common carrier, and, as such, is subject to all the duties and responsibilities of common carriers at common law. *Railway Co.* v. *Wynn*, 4 Pickle, 320; *Transportation Co.* v. *Bloch Bros.*, 2 Pickle, 392; *Baker* v. *Railroad Co.*, 10 Lea, 304; *Railroad Co.* v. *Jackson*, 6 Heis., 271; *Railroad Co.* v. *Hale*, 1 Pickle, 69; *Smith* v. *Railroad Co.*, 2 Pickle, 198; *Railroad Co·*

v. *Mason*, 11 Lea, 116; *Hart* v. *Railroad Co.*, 112 U. S., 331; *Ayers* v. *Railroad Co.*, 71 Wis., 372; 5 Am. St. Rep., 226; 1 Am. St. Rep., 721.

Such company can only be excused by the act of God or the public enemy, or in a shipment of live-stock, where the injuries result from the inherent nature, propensities, or habits of the animals themselves. *Railroad Co.* v. *Wynn*, 4 Pickle, 320; *Transportation Co.* v. *Bloch Bros.*, 2 Pickle, 392; *Converse* v. *Brainerd*, 27 Conn., 607; *Condict* v. *Railroad Co.*, 54 N. Y., 504.

Where the act of God is invoked as a defense, it must be the proximate cause of the injury. If the act of a third party, or of the carrier or its agents, is the proximate cause, but the act of God is the remote cause, it is not available as a defense. *New Brunswick Steam-boat Co.* v. *Tiers et al.*, 4 Zab. (N. J.), 697; *Backhouse* v. *Sneed*, 1 Murphy (N. C.), 173; *Railroad Co.* v. *Reeves*, 10 Wall. (U. S.), 176; *Converse* v. *Brainerd*, 27 Conn., 607.

The subcarriers employed by an express company are its agents, and not the agents of the shippers, unless so expressly stipulated. *Transportation Co.* v. *Bloch Bros.*, 2 Pickle, 392.

If the company found it necessary to hand over the horses to another company, it had the legal right to do so; but it did not thereby relieve itself from liability to the shipper, unless it was so expressly stipulated between the shipper and company.

There is evidence in this case that the company could have transshipped these horses at Cincinnati over other express lines, such as the United States, the American, the Baltimore & Ohio, all of which had routes to New York over lines of railroad which had ample facilities for safe and rapid transportation, but it declined to do so in order to obtain the longer haul over its own route to Pittsburg, where it was under the necessity of sending the horses over an inferior line of railroad, with limited accommodations and facilities for rapid and safe transit, and, at that time, congested with unusual business, caused by the recent floods. It is also shown that the company did not exercise that diligence in procuring beforehand transportation over the route selected, and it was only when the horses had reached or were nearing Pittsburg that any application was made to the superintendent of the Pittsburg and Western Road for special arrangements for this particular shipment—too late for them to be procured, if, indeed, they could have been furnished at all.

There is sufficient evidence as to the injury done to the horses, and the damage sustained in consequence, and the verdict of the jury is sustained by the evidence as to the amount of damages.

The judgment of the Court below will be affirmed, with costs.